UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————

N<u>o</u> 03-CV-0584 (JFB) (LB)

———————

CHARLES PATRICK,

Plaintiff,

VERSUS

NEW YORK CITY TRANSIT AUTHORITY,

Defendant.

———————

MEMORANDUM AND ORDER
July 16, 2007

———————

JOSEPH F. BIANCO, District Judge:

*Pro se* plaintiff Charles Patrick ("plaintiff") brings this action under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, alleging that defendant New York City Transit Authority ("NYCTA") retaliated against him for filing a prior discrimination lawsuit against defendant.[1] Defendant moves, unopposed, for summary judgment pursuant to Federal Rule of Civil Procedure 56. Despite plaintiff's failure to oppose the motion, the Court independently conducted a review of the record and finds that summary judgment for defendant is warranted.[2]

---

[1] Though plaintiff erroneously filed his complaint under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et. seq.*, as the Honorable Judge Raymond Dearie previously determined in this action, the Court treats the complaint as though it was appropriately filed under the ADEA. *See* Memorandum and Order dated July 20, 2004 ("Because the same standards apply to both ADEA and Title VII cases, the Court will treat the complaint as if it had been filed correctly under the ADEA.") (citing *Terry v. Ashcroft*, 336 F.3d 128, 141 (2d Cir. 2003) (holding that ADEA retaliation claims are analyzed under Title VII framework)).

[2] The Second Circuit has clearly established that a district court may not grant an unopposed summary judgment motion without carefully analyzing the moving papers to determine whether the moving party satisfies its burden of demonstrating that there are no material issues of fact for trial. *See Vt. Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) ("[W]here the non-moving party 'chooses

## I. BACKGROUND

### A. Facts

The facts, undisputed by plaintiff, are provided below. For the purposes of this motion, the Court notes that it has construed the facts in the light most favorable to the non-moving party – in this case, the plaintiff – "with all factual ambiguities resolved and all reasonable inferences drawn in his favor."[3]

---

the perilous path of failing to submit a response to a summary judgment motion, the district court may not grant the motion without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial.'") (quoting *Amaker v. Foley*, 274 F.3d 677, 681 (2d Cir. 2001)).

[3] Defendant submitted a statement, pursuant to Local Civil Rule 56.1, which asserts material facts which it claims are undisputed in this case. Defendant also complied with Local Civil Rule 56.2 by providing notice to *pro se* plaintiff that he is not entitled to simply rely on the allegations in his complaint, but is required to submit evidence, including sworn affidavits, witness statements and documents to respond to the motion for summary judgment, pursuant to Rule 56(3). (*See* Notice to *Pro Se* Litigant dated August 24, 2006.) This action provided actual notice to plaintiff of the consequences of non-compliance with the requirements of Rule 56. *See, e.g., Irby v. N.Y. City Transit Auth.*, 262 F.3d 412, 414 (2d Cir. 2001) ("[W]e remind the district courts of this circuit, as well as summary judgment movants, of the necessity that *pro se* litigants have actual notice, provided in an accessible manner, of the consequences of the *pro se* litigant's failure to comply with the requirements of Rule 56. . . . [E]ither the district court or the moving party is to supply the *pro se* litigant with notice of the requirements of Rule 56. . . . In absence of such notice or a clear understanding by the *pro se*

*Capobianco v. City of New York*, 422 F.3d 47, 50 n.1 (2d Cir. 2000) (citations omitted).

### A. The Parties

Pursuant to Public Authorities Law § 1201 *et seq.*, NYCTA is a public benefit corporation. *See* N.Y. Pub. Auth. Law § 1201(1). NYCTA was created by the State of New York for the purpose of operating transit facilities. (Def.'s 56.1 Stmt. ¶ 1.) Plaintiff began his employment with NYCTA in August 1970 as a Railroad Stock Assistant, and was promoted to Railroad Stock Worker Level II in 1974. (Pl.'s Dep. at 8-9.) According to the MTA's Rules and Regulations, which govern the operation of the New York City Transit System (*see* Affidavit of Patrick McGreal (hereinafter "McGreal Aff.") ¶ 18, Ex. B), the duties and

---

litigant of the consequences of failing to comply with Rule 56, *vacatur* of the summary judgment motion is virtually automatic."). As indicated *supra*, plaintiff did not oppose defendant's motion for summary judgment and, thus, did not provide a counter-56.1 Statement. Therefore, the Court accepts the facts recited in defendant's Rule 56.1 Statement as true where such facts are supported by the record. *See, e.g., Pierre-Antoine v. City of New York*, No. 04-CV-6987 (GEL), 2006 U.S. Dist. LEXIS 28963, at *8 (S.D.N.Y. May 9, 2006) (deeming facts in defendants' Rule 56.1 statement as admitted by *pro se* plaintiff, where plaintiff was provided with notice of failure to properly respond to a summary judgment motion under Local Civil Rule 56.2 and the court's review of the record did not reveal that there was a genuine issue of fact); *Gilliam v. Trs. of Sheet Metal Workers' Nat'l Pension Fund*, No. 03-CV-7421 (KMK), 2005 U.S. Dist. LEXIS 7904, at *1 n.2 (S.D.N.Y. May 3, 2005) (deeming defendant's factual assertions admitted where *pro se* plaintiff was provided with notice under Local Civil Rule 56.2 and where plaintiff did not submit evidence controverting those facts).

2

responsibilities of a Railroad Stock Worker include, under direct supervision, receiving, checking, classifying, storing and distributing materials and supplies to the transit system's storerooms and facilities. (*Id*., Ex. B at 237.) The duties and responsibilities of a Railroad Stock Worker Level II include, under direct supervision, receiving, checking, classifying, storing, and distributing supplies and materials in the storerooms of NYCTA. (*Id*., at 238.) A Level II Railroad Stock Worker also drives, loads, and unloads or operates department vehicles; unpacks materials and supplies and counts sorts, marks and places them; takes inventory and fills requisition; separates obsolete and scrap materials, and keeps records. (*Id*.) The job descriptions are not exhaustive and employees may be called upon to perform duties that are generally covered by a job title, even though not specifically enumerated in the Rules and Regulations, but which the NYCTA is otherwise authorized to prescribe. (*Id*. ¶ 30, Ex. B at 237.)

B. Plaintiff's Prior Lawsuit

In 1999, plaintiff instituted an action against NYCTA in the United States District Court for the Eastern District of New York alleging discrimination based on his age in violation of the ADEA. *See Patrick v. N.Y. City Transit Auth.*, 99-CV-1024 (RJD). That case was dismissed on summary judgment. (*See id*., Memorandum and Order dated March 2, 2004 (Doc. Entry # 32.); *see also* Pl.'s Dep. at 15.) Plaintiff instituted the present action alleging retaliation by defendant since December 1, 2001, in response to the filing of the discrimination suit.[4] (Compl. at 3-4.) Plaintiff's complaint alleges that plaintiff was subjected to excessive disciplinary action, seniority and union contract violations, and wrongful suspension. (Compl. at 4.)

C. Responsibilities and Regulations under the Collective Bargaining Agreement

Plaintiff, along with most Railroad Stock Workers, is represented by the Transport Workers Union, Local 100 (the "Union"). (McGreal Aff. ¶ 3.) NYCTA and the Union entered into a Collective Bargaining Agreement and subsequent Memorandum of Understanding which amended the Collective Bargaining Agreement, covering the time period of January 1, 2000 to December 15, 2005 (hereinafter referred to as the "CBA"). (*Id*.) The CBA contains provisions regarding the terms and conditions of employment of the employees represented by the Union. (*Id*.) The CBA also contains disciplinary and contract grievance processes for employees represented by the Union. (*Id*.) The disciplinary grievance process is a series of steps/hearings which culminates in arbitration. (*Id*., ¶ 4.)

Pursuant to the CBA, if an employee fails to appear on two occasions at any step hearing in the disciplinary grievance procedure, the grievance shall be deemed abandoned and the

---

[4] Although plaintiff's complaint alleges retaliatory conduct commencing on December 1, 2001 and continuing through the filing of the complaint in the instant action, plaintiff refers to a number of events which appear to have occurred prior to December 1, 2001. Accordingly, the Court addresses and discusses events that occurred prior to December 1, 2001, but after the filing of plaintiff's complaint in the initial discrimination lawsuit in February 1999.

3

penalty imposed. (*Id.*, ¶ 6.) Employees are to be notified of such hearings through personal service or by certified mail. (*Id.*, Ex. A. at 40.) The Union or the employee may appeal disciplinary actions within five days of notification of the decision at Step I of the grievance process. (*Id.*, ¶ 7.) The CBA requires that employees, the Union and the NYCTA strictly adhere to the time limits provided in Section II of the CBA. (*Id.*, ¶ 8.)

The CBA also provides regulations regarding vacation time. Specifically, for an employee working in the Division of Supply Logistics, the CBA provides:

> Employees must submit their requests for vacation in unscheduled single days, Accumulated Vacation Allowances (AVA), and/or personal leave days (PLD) no sooner than fifteen (15) days prior to the requested days. Such requested time will be granted, by seniority, when coverage is available, five (5) working days in advance of the requested day. Requests to use leave in these categories submitted by employees less than five (5) working days prior to the requested day shall be reviewed by Management and approved or denied on the same day submitted based upon staffing requirements and the needs of service. Requests to use leave in these categories submitted with less than forty eight (48) hours notice prior to the requested day shall be deemed emergency requests and may be approved or denied by Management subject to proof of emergency and the needs of service.

(*Id.*, Ex. A.)

With respect to assignments, under the CBA, an employee may express his or her preference to work on certain assignments, as listed by management – this is referred to as "a pick." (*Id.*, ¶ 15.) The employee picks those assignments for a specified period of time from the list of available assignments, in order of seniority, and once a particular assignment or time is picked, it is removed from the list of assignments available for picking by persons with lower seniority. (*Id.*) For an employee in the division of Supply Logistics, the CBA states that it "is understood that any employee must be qualified for the job he/she selects [during the pick process], and in addition must be able to meet normal production in a reasonable length of time, normally a period of ten (10) days." (*Id.* ¶¶ 9-10 (quoting *id.*, Ex. A at 150).)

On May 1, 2000, at plaintiff's request, an informal meeting was held between plaintiff, plaintiff's union representative and Howard Kocan ("Kocan"), regarding plaintiff's concerns that his pick preference was being violated.[5] (Kocan Aff. ¶ 30; *see also id.*, Ex. B.)

---

[5] From April 2000 until February 2003, Kocan, as Superintendent of Buses Base Support South, was responsible for day-to-day management of operations for storerooms that supported the (Bus) East New York Central Maintenance Facility and Non-Revenue Support Facilities. (*Id.*, ¶ 1.) Kocan was in the line of supervision of plaintiff in that position. (*Id.*) Thereafter, from March 2003 to September 2003, Kocan was General Superintendent of Southern Field Operations, where he was responsible for the direction and control of "off-shift" operations for storerooms that supported the (Bus) East New York Central Maintenance Facility. (*Id.*) Kocan was also in the line of supervision of plaintiff in that position. (*Id.*)

4

At the May 1, 2000 meeting, plaintiff's pick assignment/preference – warehousing – was discussed and Kocan explained to plaintiff that warehousing is any task other than the receipt of material from a vendor/inter storeroom transfer, kitting or utility. (*Id*., ¶ 4.)

Kocan also discussed with plaintiff the definition of seniority rights with respect to a pick preference versus daily assignments. (*Id*.) Plaintiff was informed that his seniority rights were not a factor in determining a particular warehousing task in Buses Base Support/East New York. (*Id*.) Plaintiff was also informed of the procedure of complying with orders and grieving after the fact on issues other than health and safety – specifically, he was reminded of his obligation to comply with any supervisor's or manager's order or assignment that does not seriously impact health or safety. (*Id*., ¶¶ 4-5.)

On June 14, 2000, as a result of repeated verbal feedback from plaintiff's two immediate supervisors and Deputy Superintendent Curley Brown ("Brown"), regarding plaintiff's frequent challenges to assignments based on claims of seniority or pick preference, Kocan again met with plaintiff. (*Id*., ¶¶ 5-6.) Plaintiff's union shop steward was also present at the meeting. (*Id*.) Three of the same issues that were discussed at the May 1, 2000 meeting were again discussed at the June 14, 2000 meeting: (1) an explanation of warehousing; (2) an explanation of seniority rights with respect to pick preference versus daily assignments; and (3) the procedure for complying with orders and grieving after the fact on issues other than health and safety. (*Id*., ¶ 7.) Also discussed were the consequences of refusing orders and/or assignments, and plaintiff was warned that refusing orders and/or assignments would be considered gross insubordination and would result in disciplinary action. (*Id*.) It was also discussed that challenging an order and/or an assignment would be considered the same as a refusal, and Kocan reminded plaintiff that compliance with a supervisor's or manager's orders is mandatory and not subject to discussion. (*Id*., ¶¶ 5, 7.) Plaintiff was also told that no employee owns any particular job or has a fixed job assignment or work location with a job preference. (*Id*.)

### D. Plaintiff's Injury

On October 13, 2000, at 7:10 a.m., plaintiff attempted to sit in a chair and fell to the floor, sustaining injuries to his left hand. (*Id*., ¶ 9.) Plaintiff requested medical care and an ambulance took plaintiff to Brookdale hospital at 8:05 a.m. (*Id*.) As of 7:10 a.m., the time of plaintiff's injury and request for medical care, plaintiff ceased his full work status and became classified as injured on duty ("IOD"), which is covered by workers' compensation. (*Id*., ¶ 10.) Because he was no longer in a work status, according to management, contractually, he was not entitled to get a coffee or lunch break. (*Id*.)

Kocan arrived at Brookdale hospital at 8:45 a.m. and stayed until plaintiff was seen by a doctor and released. (*Id*., ¶ 11.) At that time, it was NYCTA procedure for the NYCTA medical assessment center ("MAC") to assess employees who were injured on duty. (*Id*.) Therefore, after plaintiff was released from the hospital, Kocan brought plaintiff to the MAC for evaluation. (*Id*.) The NYCTA physician gave plaintiff a "no work" status until November 1, 2000, and a revisit to the MAC was scheduled for November 1, 2000. (*Id*., ¶ 12; *see also id*., Ex. D.)

### E. The Late Charges

On September 13, 2000, Kocan spoke with plaintiff regarding four instances of lateness since July 24, 2000. (*Id*., ¶ 8.) Kocan also pointed out that plaintiff had three instances of lateness in June 2000 and warned plaintiff that, if he continued this pattern, it would result in disciplinary actions being brought against him. (*Id*.)

On February 2, 2001, plaintiff was notified that he was being brought up on disciplinary charges for reporting late for duty on December 20, 2000, January 4, 2001 and January 22, 2001, and that the penalty being imposed was a warning. (*Id*., Ex. F.) Plaintiff appealed the charges on February 6, 2001, and, on February 13, 2001, a Step I meeting was held. (*Id*.) At the Step I meeting, the charges and the penalty of a warning were sustained. (*Id*.) Plaintiff appealed the Step I decision but failed to appear at the Step II hearing, and the recommended penalty of warning was implemented pursuant to the CBA. (*Id*.) Plaintiff does not dispute that he was late on December 20, 2000, January 4, 2001 and January 22, 2001. (Pl.'s Dep. at 28.)

On July 31, 2001, plaintiff was notified that he was being brought up on disciplinary charges for reporting late for duty without explanation on July 23, 2001, and that a penalty of a one-day suspension was being imposed. (Kocan Aff., Ex. G.) Plaintiff appealed the charges and a Step I meeting was held on August 10, 2001, where the penalty of a one-day suspension was sustained. (*Id*.) Plaintiff appealed the Step I decision and on December 17, 2001, an agreed-to penalty of reprimand was entered by stipulation. (*Id*.) Plaintiff does not dispute that he was late on July 23, 2001. (Pl.'s Dep. at 28.)

On November 5, 2001, plaintiff was notified that he was being brought up on disciplinary charges for reporting late without a satisfactory explanation on October 22, 2001 and November 2, 2001, and that a penalty of a one-day suspension was being imposed. (Kocan Aff., Ex. I.) Plaintiff appealed, and the charges and penalty were sustained at a Step I meeting held on November 9, 2001. (*Id*.) Plaintiff and his union representative neither appealed nor accepted the Step I decision. (*Id*.) Because the decision was not appealed within the time allowed, the penalty of a one-day suspension was imposed on November 23, 2001. (*Id*.) Plaintiff admits he was late on October 22, 2001 and November 2, 2001. (Pl.'s Dep. at 29-30.)

On January 30, 2002, plaintiff was informed that he was being brought up on disciplinary charges for leaving his assigned work area for ten minutes on January 25, 2002, without his supervisor's knowledge or permission and for becoming loud, disrespectful and challenging orders from his supervisors when questioned regarding his whereabouts. (Kocan Aff., Ex. J.) A ten-day suspension was to be imposed as the penalty. (*Id*.) Plaintiff appealed the charges and a Step I meeting was held on February 12, 2002, at which the charges and penalty were sustained. (*Id*.) Plaintiff and his union representative appealed the Step I decision and a Step II hearing was held on February 28, 2002, at which the charges and penalty were sustained. (Kocan Aff., Ex. K.) The disciplinary case went to an Arbitration Hearing. (*Id*.) The Arbitration Board sustained the charges, but implemented a penalty of warning because the Board found that plaintiff's behavior did not rise to the level of a violation. (*Id*.) Plaintiff admits that he left work without permission on January 25, 2002. (*See* Pl.'s Dep. at 32-

6

33.)

On April 19, 2002, plaintiff was informed that he was being brought up on disciplinary charges for arriving late to work on April 8, 2002 and that a penalty of a five-day suspension, for the record only, was to be imposed.[6] (Kocan Aff. ¶ 21, Ex. L.) Plaintiff appealed and a Step I meeting was held on April 19, 2002, where the charges and the penalty were sustained. (*Id.*) Plaintiff and his union representative appealed the Step I decision. (Kocan Aff. ¶ 21.) As described below, the charges were consolidated with two other disciplinary charges for lateness and a one-day suspension for the record only was imposed on May 13, 2002, on all three charges. (*Id.*, Ex. L.)

On April 30, 2002, plaintiff was informed that he was being brought up on disciplinary charges for arriving late to work without a satisfactory explanation on April 24, 2002, and that a ten-day suspension, for the record only, was to be imposed. (*Id.*, Ex. M.) Plaintiff appealed the charge and a Step I meeting was held on April 30, 2002, where the charges and penalty were sustained. (*Id.*) Plaintiff and his union representative appealed the Step I decision. (*Id.*) Plaintiff did not dispute that he was late on April 24, 2002 (*See id.* (attaching note from plaintiff stating that he was late because he overslept).)

On May 13, 2002, a Step III hearing was held where the charges were sustained on the April 19, 2002, April 30, 2002, and November 2, 2001 disciplinary cases, and it was determined that the combined penalty would be a one-day suspension for the record only. (*Id.*, Ex. N.) Plaintiff and his union representative accepted the decision. (*Id.*)

F. Requests for Vacation Days

According to Kocan, on twenty-four occasions between 2000 and 2003, plaintiff requested and received either a single vacation day or personal-leave day. (*Id.* ¶ 3; *see also id.*, Ex. A.) These requests were approved by his supervisors or members of management, including Kocan and Deputy Superintendent Brown. (*Id.*)

On September 13, 2001, plaintiff requested September 14, 2001 off as a single vacation day in order to attend an appointment to resolve a warranty claim on his Ford Focus. (Pl.'s Dep. at 51; Kocan Aff., Ex. H.) The request was denied on September 13, 2001 by Superintendent Brown. (*Id.*) As a result of the World Trade Center attacks, all time requests that were submitted within approximately one week after September 11, 2001, were denied for all employees in the Bus Base Support South operation, and only previously scheduled vacation leave was permitted. (*Id.*) Plaintiff also alleges that he was denied a vacation day to attend court with his son. (Pl.'s Dep. at 67.) Plaintiff also asserts in his deposition that he was denied a request to take a half-vacation day to pick up his wife, who is disabled. (*Id.* at 75.) Plaintiff requested the half-vacation day on the day he wanted to take it. (*Id.*)

G. Plaintiff's Complaint Regarding Lack of Overtime Pay

On January 31, 2002, plaintiff filed a complaint alleging that he was not paid time-and-a-half for thirty-seven minutes of

---

[6] A charge that is "for the record only" indicates that the penalty will be put on the employee's records for progressive disciplinary purposes, but the employee will not have to actually serve the suspension. (McGreal Aff. ¶ 31.)

7

overtime performed on the date of his workers compensation hearing on January 23, 2003. (Kocan Aff. ¶ 37, Ex Y.) Management responded that, according to the CBA, plaintiff was paid for the twenty-two minutes that he worked beyond 3:00 p.m., his regular quitting time. (*Id*.; *see also* McGreal Aff. ¶¶ 13-14, Ex. A.) Management responded that "'37' under [the] hours column for 'other payment' is the decimal equivelent of 22 minutes." (Kocan Aff., Ex. Y.) Furthermore, pursuant to the CBA, an employee is entitled to straight-time pay for attending a hearing or investigation during a period partly within and partly outside the employees regular working hours, not time-and-a-half. (McGreal Aff. ¶¶ 13-14, Ex. A.) Though plaintiff claims that this incident is part of the instant action, plaintiff could not recall whether the issue was resolved. (Pl.'s Dep. at 54.)

### H. Plaintiff's Errors on the Job

On May 1, 2002, pursuant to the CBA, plaintiff exercised his seniority rights and was granted a realignment request to change from his then current job, which was a warehousing preference, to a receiving preference in Buses Base Support South effective May 5, 2002. (Kocan Aff. ¶ 24, Ex. O.) The duties of a Level II Railroad Stock Worker in a receiving preference include unloading material off the vendor or NYCTA trucks, and processing the paperwork. (Affidavit of Terrance Ecock (hereinafter "Ecock Aff."), ¶ 3.) The processing of paperwork involves inputting information, including the purchase order from the vendor's documentation, into the Purchasing Receiving and Accounts Payable system (the "PRAP system"). (*Id*.) Once a purchasing order is inputted into the PRAP system, a Material Receiving Report is issued. (*Id*.) The material cannot be released to any NYCTA users before an inspector has inspected the material. (*Id*.) There is a policy instruction manual detailing the procedures for receipt of material. (*Id*., ¶ 4, Ex. A.)

On June 25, 2002, Kocan drafted a memorandum to Terrance Ecock ("Ecock"), who was the Maintenance Supervisor, Level I, in storeroom 63, and plaintiff's direct supervisor in the receiving preference from May 2002 until April 2003. (Kocan Aff. ¶ 66; Ecock Aff. ¶¶ 1-2.) The memorandum requested that Ecock inform all employees that they should not accept material from a vendor that is not adequately marked with a purchase order number, and to inform Kocan why a certain delivery was received without a dock receipt check of the purchase order number and why no receiving stamp was on the paperwork, as is proper procedure. (Kocan Aff., Ex. P.) Kocan also asked Ecock to re-instruct plaintiff, the employee that made the mistake. (*Id*.; Kocan Aff. ¶ 26.) Pursuant to Kocan's request, Ecock re-instructed plaintiff on June 26, 2002 regarding the proper procedures for receiving. (Ecock Aff. ¶ 5, Ex. C.)

Plaintiff responded to Ecock's instructions on how to check for purchase order numbers using the computer system inquiry screen by stating that using the inquiry screen to check for purchase orders and refusing deliveries was not part of his job. (*Id*. ¶ 6.) Ecock informed him that it was part of his job duties. (*Id*.) On June 26, 2002, Ecock drafted a memo to Kocan regarding his re-instruction of plaintiff and plaintiff's response, contesting his job duties. (*Id*., Ex. C.) Kocan met with plaintiff and his union representative on June 26, 2002, regarding Ecock's complaint about plaintiff rejecting certain job duties. (Kocan Aff. ¶ 27, Ex. Q.) Plaintiff again responded that he should not have to refuse vendor deliveries, and Kocan asked plaintiff to write

8

a statement to that effect. (*Id*.) That same day, plaintiff gave Kocan a written statement that said that he "did not think [he had] the authority to reject any shipment coming into the [r]eceiving [storeroom]." (*Id*., Ex. R.) Because plaintiff's written statement differed from his verbal statement, Kocan sought clarification from plaintiff regarding his position, but plaintiff did not provide such clarification.[7] (*Id*., ¶ 28.)

On June 27, 2002, the Department of Buses asked Kocan to become involved in expediting the processing of a request for five exhaust filters that the PRAP system indicated were received into inventory by the NYCTA. (*Id*. ¶ 29.) While making that inquiry, Kocan discovered that plaintiff had inputted that five filters were received when, in fact, only one was received, which resulted in an $11,400 overstatement in inventory received from the vendor. (*Id*. ¶ 29-30; Kocan Aff., Ex. Q.) NYCTA had purchased five filters from the vendor, but only one filter was delivered and received. (*Id*. ¶ 29.) Kocan also discovered that plaintiff failed to stamp and sign the receiving documents. (*Id*.) When asked about the transaction, plaintiff stated that he had made a mistake processing the filters, and plaintiff wrote a statement to that effect, admitting to the mistake. (*Id*., Ex. S; *see also* Pl.'s Dep. at 41.) Plaintiff was not brought up on disciplinary charges as a result of the incident. (Kocan Aff. ¶ 29.)

---

[7] Though Kocan's affidavit indicates that these events took place on June 27, 2002, it appears from the exhibits attached thereto that Kocan met with plaintiff and received a written statement from plaintiff on June 26, 2002. (*See* Kocan Aff., Exs. Q, R.) In any event, whether these events in fact occurred on June 26, 2002 or June 27, 2002, is immaterial to the instant motion.

On June 28, 2002, Kocan met with plaintiff and his union representative regarding plaintiff's errors while working in receiving. (*Id*. ¶ 31, Ex. T.) Kocan expressed his concern, noting that plaintiff had been in the receiving assignment for several weeks and should not still be making such mistakes. (*Id*.) Kocan offered plaintiff the possibility of switching out of the receiving assignment into a new assignment or the opportunity to receive any necessary re-training. (*Id*.) In light of plaintiff's upcoming vacation, Kocan suggested that plaintiff get back to him after his vacation if he wanted to follow-up. (*Id*.)

Plaintiff did not approach Kocan regarding more training or a job assignment change after he returned from vacation on July 8, 2002. (*Id*. ¶ 32.) On July 12, 2002, Kocan asked plaintiff's union representative whether plaintiff had spoken with him regarding the June 28, 2002 meeting, and the union representative stated that plaintiff had told him he intended to "stick it out." (*Id*.)

On August 30, 2002, in violation of NYCTA procedures, plaintiff processed and inputted two material receiving reports without the material first being inspected. (Ecock Aff., ¶ 9.) Though Inspector Gomez had not inspected the material, plaintiff inputted Inspector Gomez's name into the PRAP system as having inspected the material. (*Id*.) Plaintiff made the same errors on June 17, 2002, and August 23, 2002. (*Id*. ¶ 11.)

On September 13, 2002, plaintiff was notified that he was being brought up on disciplinary charges due to his repeated failure to properly perform his duties and follow procedures. (Kocan Aff. ¶ 33, Ex. U.) A September 6, 2002 memorandum from Ecock to Kocan detailed the specific incidents of

9

which plaintiff was accused that led to the disciplinary charges, including: (1) on June 17, 2002, August 23, 2002 and August 30, 2002, in violation of NYCTA procedures, plaintiff processed and inputted two material receiving reports without the material first being inspected, and though Inspector Gomez had not inspected the material, plaintiff inputted Inspector Gomez's name into the PRAP system as having inspected the material; (2) failure to properly record number of cartons associated with vendor delivery and apply the proper date stamp; and (3) on August 16, 2002, plaintiff failed to properly input the number of pieces received from a vendor into the PRAP system, on two separate vendor receipts, causing an overstatement in inventory value of $7,313,86. (*Id.*, Ex. D; *see also* Ecock Aff. ¶¶ 9, 11.)

A three-day suspension was to be imposed for the September 13, 2002 charges. (*Id.*) Plaintiff appealed the charges and a Step I meeting was held on September 23, 2002, at which the charges were sustained and the three-day suspension was upheld. (*Id.*) Plaintiff and his union representative appealed the Step I decision; however, the arbitration was taken off the calendar. (*Id.*, ¶ 33, Ex. V.)

On October 8, 2002 and October 25, 2002, plaintiff inputted four Material Receiving Reports without the material first being inspected, but inputted Inspector Gomez's name into the PRAP system as having inspected the material. (Ecock Aff. ¶ 16.) On October 14, 2002, plaintiff failed to properly input into the PRAP system the number of pieces received from the vendor, resulting in a $1,612.80 understatement in the inventory. (*Id.* ¶ 18.) On November 6, 2002, Ecock drafted a memorandum to Kocan regarding plaintiff's October 8, 2002, October 25, 2002 and October 25, 2002 mistakes. (*Id.* ¶ 20, Ex. E.) The memorandum also stated that on October 14, 2002, plaintiff failed to properly input into the PRAP system the number of pieces received from a vendor resulting in a $1,612.80 understatement in inventory. (*Id.*) Though there is documentation of the error (*see id.*), plaintiff denied the October 14, 2002 mistake in his deposition. (Pl.'s Dep. at 42.)

On November 8, 2006, plaintiff was notified that he was being brought up on disciplinary charges for his October 8, 2002, October 14, 2002, and October 25, 2002 errors. (Kocan Aff. ¶ 25, Ex. W.) A ten-day suspension was to be imposed. (*Id.*) Plaintiff appealed the charges and a Step I meeting was held on December 12, 2002, at which the charges were sustained and the penalties upheld. (*Id.*) Plaintiff and his union representative appealed the Step I decision. (*Id.*)

On January 28, 2003, plaintiff failed to properly perform his duties by recording erroneous information on a receiving report. (Ecock Aff. ¶ 21.) Plaintiff had been re-instructed the prior week, on January 21, 2003, on the process at issue when he had made the same error. (*Id.*) Plaintiff was notified of his repeated errors by Ecock on January 29, 2003. (*Id.* ¶ 23) According to Ecock, plaintiff responded: "I made a mistake, what are you going to do about it?" (*Id.*) On February 18, 2003, plaintiff was informed that he was being brought up on disciplinary charges for recording erroneous data, and that a penalty of a thirty-day suspension with a final warning was going to be imposed. (Kocan Aff. ¶ 36.) Plaintiff appealed, and on February 18, 2003, a Step I meeting was held at which the charges and penalty were sustained. (*Id.*, ¶ 36, Ex. X.) Plaintiff and his union representative appealed the Step I decision. (*Id.*)

10

On February 23, 2003, plaintiff submitted his retirement application, and, thus, the November 8, 2006 and February 18, 2003 disciplinary actions were never submitted for arbitration. (*Id.*, ¶¶ 34-36.) NYCTA performed a Final Evaluation of Separating Employee on May 6, 2003, where it indicated that plaintiff's overall work performance was unsatisfactory because plaintiff retired with a disciplinary action pending. (*Id.*, Ex. Z.)

I. Procedural History

Plaintiff filed the complaint in this action on February 5, 2003, alleging that defendant retaliated against him for filing a prior discrimination lawsuit against defendant. On March 25, 2004, defendant moved to dismiss the complaint on the ground that plaintiff's claim was time barred. Plaintiff did not file an opposition. By Memorandum and Order dated July 30, 2004, Judge Dearie denied defendant's motion. On February 7, 2006, this case was re-assigned to the undersigned. After completion of discovery, in accordance with a schedule set by Magistrate Judge Bloom, defendant filed the instant motion for summary judgment. As discussed *supra*, defendant included, along with its motion, a notice to *pro se* litigants opposing a motion for summary judgment, pursuant to Local Civil Rule 56.2. Plaintiff was served with defendant's motion and Rule 56.2 notice on August 24, 2006, and plaintiff's opposition was due October 5, 2006. However, plaintiff never served an opposition to defendant's motion and, thus, defendant filed its motion with the Court on October 23, 2006 pursuant to Magistrate Judge Bloom's scheduling order.

II. Discussion

A. Standard of Review

Pursuant to Federal Rule of Civil Procedure 56(c), a court may not grant a motion for summary judgment unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Globecon Group, LLC v. Hartford Fire Ins. Co.*, 434 F.3d 165, 170 (2d Cir. 2006). Moreover, where the plaintiff is proceeding *pro se*, the Court must "construe the complaint broadly, and interpret it to raise the strongest arguments that it suggests." *Weixel v. Bd. of Educ. of the City of N.Y.*, 287 F.3d 138, 145-46 (2d Cir. 2002) (quoting *Cruz v. Gomez*, 202 F.3d 593, 597 (2d Cir. 2000)).

The moving party bears the initial burden of showing that he or she is entitled to summary judgment. *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). However, once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*." *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). Thus, the nonmoving party may not rest upon mere conclusory allegations or denials, but must set forth "concrete particulars" showing that a trial is needed. *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (internal quotations omitted).

11

Though a *pro se* litigant's pleadings are afforded wide latitude, a *pro se* party's "bald assertion," completely unsupported by evidence, is not sufficient to defeat a motion for summary judgment. *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991). Instead, to overcome a motion for summary judgment, the non-moving party "must bring forward some affirmative indication that his version of relevant events is not fanciful." *Podell v. Citicorp Diners Club, Inc.*, 112 F.3d 98, 101 (2d Cir. 1997) (internal ciations omi; *see also Morris v. Alex Group USA, Inc.*, No. 04-CV-8239 (PAC), 2007 U.S. Dist. LEXIS 47674, at *10 (S.D.N.Y. June 28, 2007) ("'[T]o survive summary judgment, plaintiff's facts 'must be material and of a substantial nature, not fanciful, frivolous, gauzy, spurious, irrelevant, gossamer inferences, conjectural, speculative, nor merely suspicions.'"(quoting *Contemporary Mission, Inc. v. U.S. Postal Serv.*, 648 F.2d 97, 107 n.14 (2d Cir. 1981)).

The Second Circuit has provided additional guidance regarding summary judgment motions in discrimination cases:

> We have sometimes noted that an extra measure of caution is merited in affirming summary judgment in a discrimination action because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions. *See, e.g.*, *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994). Nonetheless, "summary judgment remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact." *McLee v. Chrysler Corp.*, 109 F.3d 130, 135 (2d Cir. 1997); *see also Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001) ("It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases.").

*Schiano v. Quality Payroll Sys.*, 445 F.3d 597, 603 (2d Cir. 2006) (quoting *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir. 2001)).

B. Plaintiff's Claim[8]

The ADEA prohibits employers from discriminating against an employee because the employee "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). A claim of retaliation is analyzed under the three-step burden-shifting analysis set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973). *See Terry*, 336 F.3d at 141. To establish a *prima facie* case of retaliation, a plaintiff must demonstrate by a preponderance of the evidence that: (1) plaintiff was engaged in a protected activity; (2) the employer was aware of his activity; (3) the employer took adverse action against plaintiff; and (4) a causal connection exists between the protected

---

[8] As described *supra*, plaintiff's complaint specifically alleges retaliation for the filing of his prior lawsuit, and no other claims. In any event, to the extent plaintiff's complaint could be read broadly to include a claim of discrimination based on race, age or gender, those claims are similarly denied because there is no evidence in the record, other than plaintiff's own unsupported conclusory allegations in his complaint and at his deposition, to find that defendant's non-discriminatory reasons for taking each of the complained of actions were pretextual.

activity and the adverse action, *i.e.*, that a retaliatory motive played a part in the adverse employment action. *Id*. Although the burden that a plaintiff must meet at the prima facie stage is minimal, the plaintiff must proffer at least competent evidence of circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive. *See Cronin v. Aetna Life Ins.*, 46 F.3d 196, 204 (2d Cir. 1995). Once plaintiff establishes a *prima facie* case, the burden shifts to the defendant to articulate some "'legitimate, nondiscriminatory reason' for the adverse employment action." *McPherson v. N.Y. City Dep't of Educ.*, 457 F.3d 211, 215 (2d Cir. 2006) (quoting *McDonnell Douglas Corp.*, 411 U.S. at 802)). After plaintiff makes a *prima facie* case and defendant offers a non-discriminatory reason, "[s]ummary judgment is appropriate . . . only if the employer's nondiscriminatory reason is dispositive and forecloses any issue of material fact." *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 134-35 (2d Cir. 2000).

Defendant does not dispute that plaintiff engaged in a protected activity by filing his initial discrimination lawsuit or that NYCTA was aware of the protected activity. Nor does defendant dispute that plaintiff was subjected to various disciplinary proceedings. However, defendant does assert that plaintiff cannot demonstrate a causal connection between the protected activity and the adverse action. Defendant also asserts that summary judgment is warranted because the undisputed facts demonstrate that defendant had legitimate, non-retaliatory reasons for taking the actions that it did, and plaintiff has no evidence from which to create a genuine issue of material fact that defendant's asserted motives were pretextual.

Plaintiff filed his discrimination suit in February 1999. Plaintiff's complaint alleges that plaintiff was subjected to excessive disciplinary action, seniority and union contract violations, being forced to work out of title, wrongful suspension, and that plaintiff was denied vacation pay and coffee and lunch breaks. (Compl. at 4-6.) Plaintiff alleges that he retired two years early as a result of the allegedly hostile work environment that was created in retaliation. (Pl.'s Dep. at 58.)

Here, as set forth below, plaintiff has produced no evidence to support a causal connection between the filing of the complaint and any adverse actions.[9] In any event, even

---

[9] The temporal proximity between the filing of plaintiff's complaint in the initial lawsuit in February 1999, and the first time plaintiff was brought up on disciplinary charges, which occurred in February 2001, is too attenuated to establish a causal connection between the protected activity and the adverse action. *See, e.g., Ruhling v. Tribune Co.*, No. 04 Civ. 2430 (ARL), 2007 WL 28283, at *23 (E.D.N.Y. Jan. 3, 2007) (finding that "a passage of two months between the protected activity and the adverse employment action seems to be the dividing line"); *Cunningham v. Consol. Edison Inc*, No. 03-CV-3522 (CPS), 2006 WL 842914, at *19 (E.D.N.Y. March 28, 2006) (same); *Hussein v. Hotel Employees & Rest. Union, Local 6*, No. 98 Civ. 9017 (SAS), 2002 WL 10441 (S.D.N.Y. Jan. 3 2002) (finding that the passage of more than two months defeats any retaliatory nexus); *Ponticelli v. Zurich Amer. Ins. Group*, 16 F. Supp. 2d 414, 436 (S.D.N.Y.1998) (finding that a "two-and-a-half month[]" interval "is hardly the close proximity of time . . . for allowing a plaintiff to establish the 'causal connection' element") (citation omitted); *see also Hollander v. Amer. Cyanamid Co.*, 895 F.2d 80, 85-86 (2d Cir. 1990) (three and a half months insufficient); *Yarde*, 360 F. Supp. 2d at 562 ("Three months is on the outer edge of what courts in this circuit recognize as sufficiently proximate to admit of an inference of

assuming *arguendo* that plaintiff could establish a *prima facie* case, defendant is entitled to summary judgment because defendant has set forth legitimate, non-retaliatory reasons for each of the complained of actions, and there is no evidence in the record from which to create a material issue of fact as to whether defendant acted in retaliation for the filing of plaintiff's initial lawsuit. Specifically, although plaintiff filed no opposition, the Court reviewed plaintiff's deposition and the record to determine if there is any evidence raising an issue of fact to show a pretextual motive, and the Court found no such evidence. As outlined below, the record demonstrates a series of violations by plaintiff of his job duties, which are either undisputed or disputed with nothing more than conclusory statements insufficient to overcome defendant's motion for summary judgment. Moreover, there is no evidence anywhere in the record that would allow a reasonable inference that actions by the employer were motivated by retaliation.

1. The Alleged Excessive Disciplinary Charges

As described *supra*, plaintiff was brought up on disciplinary charges several times for lateness and for repeated mistakes in performing his job duties. Based on a review of the record, there is no evidence from which a reasonable jury could conclude that defendant brought plaintiff up on disciplinary charges in retaliation for the filing of plaintiff's initial lawsuit.

According to defendant, plaintiff made numerous mistakes while in the receiving position. In his deposition, however, plaintiff generally denied making some of these errors. Specifically, plaintiff denied the allegations that were the subject of the September 13, 2002 notification of disciplinary charges, asserting, "All I can say is I deny everything here." (Pl.'s Dep. at 38.) Plaintiff also denied improperly inputting the amount of inventory received from the vendor on October 14, 2002. (Pl.'s Dep. at 42.) However, NYCTA provided documentation of these errors. (Ecock Aff., Ex D.) In light of the record as a whole, plaintiff's own general assertions that he did not make certain mistakes are insufficient to create an issue of fact as to pretext. Even assuming plaintiff was not responsible for the documented errors he denies making in his deposition, there is no evidence from which a reasonable jury could conclude that defendant's real reason for bringing plaintiff up on disciplinary charges was retaliation for the filing of plaintiff's initial discrimination lawsuit. *See Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 714 (2d Cir. 1996) ("To defeat a summary judgment motion, [plaintiff] must produce sufficient evidence to support a rational finding that the legitimate nondiscriminatory reasons proffered by the employer were false, and that more likely than not [discrimination] was the real reason for the discharge.") (internal quotation omitted). Similarly, plaintiff alleges in his deposition that others who made the same mistakes as plaintiff were not brought up on disciplinary charges. (Pl.'s Dep. at 16-17.) However, other than plaintiff's own bald assertions, plaintiff points

---

causation."); *Ashok v. Barnhart*, 289 F. Supp. 2d 305, 315 (E.D.N.Y 2003) ("[A] period of only two months between a protected activity and an adverse action may permit a reasonable jury to find the acts to be temporally proximate and causally related"); *Nicastro v. Runyon*, 60 F. Supp. 2d 181, 185 (S.D.N.Y. 1999) ("Claims of retaliation are routinely dismissed when as few as three months elapse between the protected EEO activity and the alleged act of retaliation.").

14

to no evidence to support this position. Given the record as a whole, plaintiff's statements, alone, are insufficient to support a claim of retaliation.

As to the lateness charges, plaintiff admits to being late each time he was brought up on disciplinary charges for such a violation. (Pl.'s Dep. at 28, 30, 37.) Furthermore, defendant affirms that other employees who were late who did not file lawsuits against NYCTA were brought up on disciplinary charges during the same time period as plaintiff and points to two disciplinary action forms. (Kocan Aff. ¶ 39, Ex. AA.)

Plaintiff also asserted in his deposition that once, when he was brought up on an "on-paper," one-day suspension, he arrived for work on Monday, and was sent home by Kocan, even though the suspension was supposed to be "on-paper" only. (Pl.'s Dep at 17-18.) Plaintiff asserts that Kocan, as management, knew the suspension was "on-paper." (*Id*. at 18.) However, the evidence shows that a one-day suspension was implemented on November 27, 2001 as a result of a disciplinary charge for reporting late on October 22, 2001 and November 2, 2001 without satisfactory explanation. (Kocan Aff. ¶ 18.) The charges and penalty were sustained at the Step I meeting on November 9, 2001, and neither plaintiff nor his union representative appealed the Step I determination within the five-day time period set forth in the CBA. (Kocan Aff. ¶ 19, Ex. I.) Thus, the penalty was implemented on November 27, 2001. (*Id*.) Other than plaintiff's vague assertions in his deposition, there is no evidence of an "on-paper" one-day suspension being improperly implemented. There is no evidence in the record from which a reasonable jury could conclude that disciplinary charges were brought in retaliation for plaintiff's filing of a prior lawsuit; thus, plaintiff has not met his burden of demonstrating the defendant's proffered reasons for bringing disciplinary charges against plaintiff were mere pretext.

2. Allegations Regarding Out of Title Job Duties

Plaintiff alleges that he was instructed by Ecock to call other staff and supervisors to tell them what items were received, despite plaintiff's assertion that use of the telephone was not part of his job. (Pl.'s Dep. at 18-19.) In particular, plaintiff complained that, at one point, he was told to call Gomez, an inspector. (*Id*. at 20.) Plaintiff asserts that he complained many times about the request to interact with different supervisors to the union, Curley Brown, who was Ecock's boss, and Kocan. (*Id*.) However, there is no evidence in the record from which a reasonable jury could conclude that any of these tasks were outside plaintiff's title or that plaintiff was forced to work outside title on any occasion. Plaintiff's general, conclusory allegations that he was forced to work outside his title are insufficient to support a claim of retaliation. Even assuming *arguendo* that plaintiff was required to use the telephone in a manner that was outside his title, there is no evidence in the record from which a reasonable jury could conclude that defendant had a retaliatory motive in requiring plaintiff to perform any particular tasks.

3. Alleged Denial of Vacation Time

As discussed *supra*, plaintiff was denied a request to take a vacation day on September 14, 2001. Defendant put forth evidence that, for approximately one week, all time requests that were submitted after September 11, 2001, were denied in light of the World Trade

Center Attacks. (Kocan Aff., Ex. H.) There is no evidence in the record from which a reasonable jury could conclude that this reason was pretextual or that the denial of plaintiff's request was motivated in retaliation for plaintiff's previous lawsuit.

Plaintiff also asserts that he was denied two hours vacation time. (Pl.'s Dep. at 21.) Specifically, one day, after working for two hours, plaintiff left work early, taking seven hours of vacation time instead of the usual nine taken in a full vacation day. (*Id*.) Later, plaintiff told Curley Brown that he had two extra hours of vacation time and would leave work two hours early one day. (*Id*.) According to plaintiff, Curley Brown refused to allow plaintiff to leave two hours early and instructed plaintiff that he should arrive two hours late one day. (*Id*.) Plaintiff alleges that he was eventually paid for his two hours of work, but that that pay was later taken back. (*Id*. at 21-22.) According to plaintiff, this event took place in 2001 or 2003. (*Id*.) Even assuming plaintiff's wholly unsubstantiated allegation that his two hours of pay was later taken back is true, there is no evidence in the record from which a reasonable jury could conclude that defendant acted in retaliation by taking such action.

4. Allegations Regarding Lunch and Coffee Break

Plaintiff also complains that he was never paid for a coffee break that he was supposed to receive, and missed, on October 13, 2000, the day he was injured falling out of a chair and went to the hospital and the NYCTA medical examiner. (Pl.'s Dep. at 22.) As explained *supra*, however, at the time of plaintiff's injury and request for medical care, plaintiff ceased his full work status and became classified as IOD. (Kocan Aff. ¶ 10.) Because plaintiff was no longer in a work status, he was not entitled to get a coffee or lunch break. (*Id*.) There is no evidence to support plaintiff's position that plaintiff was entitled to pay for a missed coffee break for a retaliatory or discriminatory reason.

5. Alleged Seniority and Union Contract Violations

Other than plaintiff's own general conclusory allegations in the complaint and deposition, there is no evidence of seniority or contract violations. Even assuming there was a seniority or contract violation, there is no evidence from which to create a material issue of fact that any violations were the result of retaliatory or discriminatory motives.

6. Allegations Regarding Overtime Pay

Plaintiff complains that he was not paid time and a half for thirty-seven minutes of overtime on January 31, 2002. As described *supra*, however, plaintiff was paid for the twenty-two minutes of straight-time due under the CBA. There is no evidence that plaintiff was denied overtime pay in retaliation for the filing of his prior lawsuit.

In sum, defendant has offered legitimate, non-retaliatory reasons for each of its actions and plaintiff has offered no evidence in support of his position that the complained-of incidents occurred in retaliation for the filing of his prior lawsuit. Plaintiff offers nothing more than conclusory allegations in his complaint and in his deposition, with no basis in fact, that he was retaliated against and, thus, there is no evidence from which to create a genuine issue of material fact for trial. *See Winkfield v. City of New York*, No. 97-CV-2183 (HB), 1999 U.S. Dist. LEXIS 19193, at *14 (S.D.N.Y. Dec. 14, 1999)

("[P]laintiff has failed to come forward with any evidence whatsoever and relies on conclusory allegations and his own belief alone. That's just not enough.") (citing *Holt v. KMI-Continental*, 95 F.3d 123, 130 (2d Cir. 1996) (summary judgment properly granted on her retaliation claim where plaintiff failed to put forth any evidence other than own personal belief that defendant's articulated nondiscriminatory reason was pretextual)); *see also Cobb v. Pozzi*, 363 F.3d 89, 108 (2d Cir. 2003) (holding that a first amendment retaliation claim cannot be based on "conclusory assertions of retaliatory motive"; rather, "[plaintff] must produce 'some tangible proof to demonstrate that [his] version of what occurred was not imaginary'") (quoting *Morris v. Lindau*, 196 F.3d 102, 111 (2d Cir. 1999)); *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998) (holding that a party opposing summary judgment "may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful"); *Carey*, 923 F.2d at 21 (holding that "bald assertion[s], completely unsupported by evidence" cannot defeat summary judgment).

### III. Conclusion

For the foregoing reasons, defendant's motion for summary judgment is granted. The Clerk of the Court shall enter judgment in favor of defendant and close this case.

SO ORDERED.

---

JOSEPH F. BIANCO
United States District Judge

Dated: July 16, 2007

Central Islip, NY

\* \* \*

Plaintiff appeared *pro se*. Attorneys for defendant are Daniel Lawrence Topper, Esq. and Michele Leigh Sheridan, Esq., New York City Transit Authority, 130 Livingston Street, 1205f, Brooklyn, New York 11201.